# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MORRIS I. ONYEWUCHI,         :

         :

         Plaintiff,         :       Civil Action No.:    08-0360 (RMU)

         :

         v.         :       Re Document Nos.:  22, 43, 51

         :

ALEJANDRO MAYORKAS,       :

Director, U.S. Citizenship and Immigration  :

Services,         :

         :

         Defendant.         :

## MEMORANDUM OPINION

### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING THE PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT; DENYING AS MOOT THE DEFENDANT'S MOTION TO STRIKE

## I. INTRODUCTION

The *pro se* plaintiff, an African-American attorney and naturalized U.S. citizen originally from Nigeria, alleges that the U.S. Citizenship and Immigration Services ("USCIS") subjected him to unlawful discrimination when it did not select him for a position for which he had applied. The plaintiff has asserted claims of disparate treatment and disparate impact on the basis of race and national origin, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000 *et seq*.

The matter is now before the court on the parties' cross-motions for summary judgment.[1] Because the plaintiff has offered insufficient evidence to rebut the defendant's legitimate, non-discriminatory justification for the plaintiff's non-selection, the court grants summary judgment

---

[1] Although both parties style their dispositive motions as ones for judgment on the pleadings or, in the alternative, summary judgment, the motions concern themselves exclusively with the sufficiency of the evidence rather than the adequacy of the pleadings. *See infra* Part III.B-C. Accordingly, the court construes the parties' submissions as solely motions for summary judgment.

to the defendant on the plaintiff's disparate treatment claims. Furthermore, the court concludes

that the plaintiff has failed to offer sufficient evidence from which a reasonable jury could infer

that a facially neutral policy employed by the defendant disproportionately affected members of

the plaintiff's protected classes. The court therefore grants summary judgment to the defendant

on the plaintiff's disparate impact claim as well.[2]


## II. FACTUAL & PROCEDURAL BACKGROUND

The plaintiff, an African-American attorney and naturalized U.S. citizen from Nigeria,

joined the Immigration and Naturalization Service ("INS") as an attorney in 2002. Am. Compl.

¶ 3. In 2003, the INS was abolished, and its responsibilities transferred to two agencies within

the Department of Homeland Security: the U.S. Immigration and Customs Enforcement

("USICE") and the USCIS. *Id.* ¶¶ 3-4. The plaintiff was assigned to USICE in 2003. *Id.* ¶ 5.

On May 6, 2004, the USCIS announced a vacancy for an Associate Counsel position in

its Dallas, Texas office. *Id.* ¶¶ 7-9. The plaintiff immediately applied for the vacancy, along

with approximately 120 other applicants. Pl.'s Statement of Material Facts ("Pl.'s Statement) ¶

6.

As described in the vacancy announcement, the position encompassed a variety of

responsibilities, including adjudicating applications for immigration benefits and services,

providing litigation support to the U.S. Attorney's Office for any actions involving the USCIS

and providing training and legal advice to the USCIS components in the Dallas, El Paso and

Kansas districts. Pl.'s Mot. for Summ. J. & Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mot. &

Opp'n"), Ex. 1H. The vacancy announcement specified that "[c]andidates should have

---

[2] As discussed below, the court denies as moot the defendant's motion to strike the plaintiff's cross-motion for summary judgment.

experience with non-employment-related petitions and applications, adjustment of status, naturalization, alien documentation and registration and inadmissibility waivers." *Id.* Relevant experience also included "experience in asylum and refugee law, immigration court, handling [Equal Employment Opportunity] and [Merit Systems Protection Board] cases, and associated training." *Id.* Strong research and writing skills were deemed "essential." *Id.*

The recommending officials responsible for reviewing the applications were Judith Patterson and Catherine Muhletaler.[3] *Id.* ¶ 10; Def.'s Statement of Material Facts ("Def.'s Statement") ¶ 4. Patterson and Muhletaler ultimately selected six individuals, including the plaintiff, to interview for the vacancy. Def.'s Statement ¶¶ 9-11. With the exception of the plaintiff, all those selected for interviews were white. Pl.'s Statement ¶¶ 15, 23.

On May 21, 2004, Patterson and Muhletaler interviewed the six remaining candidates. Def.'s Statement ¶¶ 13-15. At the conclusion of each interview, Patterson and Muhletaler briefly discussed their impressions of the candidate and, in some instances, made notations on the candidate's application materials regarding the interview. Patterson Decl. ¶ 12; Muhletaler Decl. ¶ 7. After completing all the interviews, Patterson and Muhletaler discussed the applicants and concluded that the top candidates, in descending order of preference, were William Finely, Dean Emmons and Loriane Pickrell. Patterson Decl. ¶ 13; Muhletaler Decl. ¶ 8.

Patterson subsequently composed a memorandum to Dea Carpenter,[4] the selecting official, listing the three candidates recommended by Patterson and Muhletaler and explaining the reasons for their recommendations. Def.'s Statement ¶ 20; Pl.'s Mot. & Opp'n, Ex 25A 1-3.

---

[3]     Patterson held the position of Regional Counsel of the Central Region in the Office of the Chief Counsel, USCIS ("OCC"). Def.'s Statement of Material Facts ¶ 4. Muhletaler held the position of Special Counsel to the Deputy Chief Counsel in the OCC. *Id.* Patterson is a white female and Muhletaler is a Hispanic female. *Id.* ¶ 5.

[4]     Dea Carpenter served as Acting Chief Counsel of the OCC. Def.'s Statement ¶ 6.

The memorandum stated that Patterson and Muhletaler considered "Finely the strongest of the three candidates," noting that he was the only candidate "with expertise in immigration law, customs law, and labor law" and the only candidate "who has already worked with clients in El Paso and Dallas, as well as the [USCIS] Chief Area Counsel, Central." Pl.'s Mot. & Opp'n, Ex. 25A at 3. The memorandum further stated that of the three top candidates, Finley's "interest seemed the most focused on [USCIS] work rather than location or other factors." *Id.* at 3. Carpenter adopted the recommendation of Patterson and Muhletaler and selected Finley to fill the vacancy. Def.'s Statement ¶ 26.

In June 2004, Patterson sent an e-mail to the plaintiff informing him that he had not been selected for the vacancy. Pl.'s Mot. & Opp'n, Ex. 8A. In the e-mail, Patterson advised the plaintiff that in winnowing down the applicant pool, the recommending and selecting officials had "emphasized immigration expertise, writing ability, career history, and strong educational credentials." *Id.* They had also "considered whether the applicant had ties or familiarities with the Dallas area, and various other factors." *Id.* The e-mail did not, however, specifically state why the plaintiff had not been selected. *See id.*

In October 2004, the plaintiff filed an Equal Employment Opportunity ("EEO") complaint with the USCIS, alleging that it had discriminated against him on the basis of race, disability[5] and national origin by not selecting him for the Associate Counsel position. *See generally* Def.'s Opp'n to Pl.'s 2d Mot. to Amend Compl., Ex. 4. After the USCIS denied the plaintiff's claim in May 2006, the plaintiff appealed. Am. Compl. ¶ 40. In December 2007, the Equal Employment Opportunity Commission ("EEOC") denied the appeal and notified the plaintiff of his right to sue. *Id.*

---

[5]     The plaintiff has not asserted claims for disability discrimination in this action. *See generally* Compl.; Am. Compl.

The plaintiff filed a complaint in this court on February 29, 2008, *see generally* Compl., and filed an amended complaint on March 7, 2008, *see generally* Am. Compl.  The amended complaint lists two counts: one count of disparate treatment on the basis of national origin and a second count of disparate treatment on the basis of race, both based on the defendant's failure to select him for the Associate Counsel position.  Am. Compl. ¶¶ 41-50.

On March 15, 2009, the plaintiff filed a motion for leave to file a second amended complaint to assert claim of disparate impact.  *See generally* Pl.'s 2d Mot. to Amend. Specifically, the plaintiff sought leave to supplement his complaint with claims that the defendant's reliance on the *U.S. News & World Report* law school rankings, and the resulting bias in favor of graduates of "first tier" law schools, had the effect of excluding African-American graduates of historically Black law schools, like the plaintiff, from employment opportunities.  *Id.*, Proposed 2d Am. Compl. ¶ 44.  The plaintiff also alleged that consideration of an applicant's ties or familiarity with the Dallas area had the effect of excluding foreign-born applicants from consideration.  *Id.* ¶ 85.  The defendant opposed the motion, arguing that the deadline for amending the pleadings had long since passed and that the amendment would be futile because the plaintiff had not exhausted his administrative remedies.  *See generally* Def.'s Opp'n to Pl.'s 2d Mot. to Amend Compl.

In the meantime, on March 23, 2009, the defendant moved for summary judgment on the plaintiff's disparate treatment claims.  *See generally* Def.'s Mot. for Summ. J.  The court ultimately stayed briefing of the defendant's dispositive motion based on the plaintiff's representation that he was seeking counsel to represent him in this matter.  Minute Order (May 5, 2009).  In July 2009, the plaintiff advised the court that he was in discussions with a law firm in

North Carolina to represent him in this matter, but that the plaintiff was required to be out of the country through August 2009. Pl.'s Notice (July 8, 2009) ¶ 2.

In January 2010, after several months without any communication from the plaintiff, the court directed the plaintiff to advise the court and the defendant whether he intended to retain counsel or proceed *pro se*. Minute Order (Jan. 19, 2010). The plaintiff responded that he wished to proceed without representation. Pl.'s Status Report (Feb. 4, 2010).

Accordingly, in March 2010, the court proceeded to adjudicate the plaintiff's motion for leave to file a second amended complaint. *See generally* Mem. Op. (Mar. 17, 2010). Specifically, the court denied the plaintiff's motion but observed that the operative complaint already contained the allegations underlying the disparate impact claims he sought to add through the proposed second amended complaint. *Id.* at 5-9. Thus, the court ruled that even though the operative complaint did not contain a separate count of disparate impact, the allegations in the complaint sufficiently put the defendant on notice of the plaintiff's disparate impact claims. *Id.* at 9. The court observed, however, that the defendant had not addressed the plaintiff's disparate impact claims in its motion for summary judgment because these claims were subsumed in a single, sprawling count of "National Origin Discrimination." *Id.* The court therefore granted the defendant leave to supplement its pending dispositive motion to address this disparate impact claim. *Id.* at 9-10.

Pursuant to that ruling, the defendant filed a supplemental memorandum in support of its motion for summary judgment specifically addressing the plaintiff's allegations of disparate impact. *See generally* Def.'s Supplemental Mem. Shortly thereafter, the plaintiff filed an opposition to the defendant's motion and cross-motion for summary

judgment on both his disparate treatment and disparate impact claims.[6]  *See generally* Pl.'s Mot.

& Opp'n.  The parties' dispositive motions are now ripe for adjudication.[7]

## III.  ANALYSIS

### A.    Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show "that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are

"material," a court must look to the substantive law on which each claim rests.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" is one whose resolution

could establish an element of a claim or defense and, therefore, affect the outcome of the action.

*Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

---

[6]    The plaintiff addresses his disparate treatment and disparate impact claims in two separate filings. The plaintiff's motion for summary judgment on his disparate treatment claims and his opposition to the defendant's motion for summary judgment on his disparate treatment claims are supported by one memorandum of points and authorities.  *See generally* Pl.'s Mem. of Points & Authorities in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J. and, Alternatively, Mot. for Summ. J. or J. on the Pleadings for Pl. ("Pl.'s Disparate Treatment Mem.").  Likewise, the plaintiff's motion for summary judgment on his disparate impact claims and his opposition to the defendant's motion for summary judgment on those claims are supported by one memorandum of points and authorities.  *See generally* Pl.'s Mem. of Points & Authorities in Support of Pl.'s Opp'n to Def.'s Dispositive Motions and, Alternatively, Mot. for Summ. J. or J. on the Pleadings for Pl. on His Disparate Impact Claims ("Pl.'s Disparate Impact Mem.").

[7]    In April 2010, the defendant moved to strike the plaintiff's cross-motions for summary judgment because they were filed long after the deadline for dispositive motions and without leave of the court.  *See generally* Def.'s Mot. to Strike.  Because, as discussed below, the plaintiff has not offered sufficient evidence to withstand the defendant's motion for summary judgment, much less establish his own entitlement to summary judgment, the court denies the plaintiff's cross-motions for summary judgment and denies as moot the defendant's motion to strike.

*Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

### B. The Court Grants Summary Judgment to the Defendant on the Plaintiff's Disparate Treatment Claims

### 1. Legal Standard for Disparate Treatment Under Title VII

When the defendant in a Title VII case presents a legitimate, non-discriminatory reason for its actions,[8] the district court need resolve only one question to adjudicate a motion for summary judgment: "Has the employee produced sufficient evidence for a reasonable jury to

---

[8]     In those rare cases in which the defendant fails to present a legitimate, non-discriminatory reason for its actions, the court must follow a three-part burden-shifting analysis known as the *McDonnell Douglas* framework. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (noting that once the defendant presents a legitimate non-discriminatory reason "the *McDonnell Douglas* framework . . . disappears, and the sole remaining issue is discrimination *vel non*") (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973)); *see also Brady*, 520 F.3d at 494 (explaining that "the prima facie case is a largely unnecessary sideshow").

find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008). The court must consider whether the jury could infer discrimination from (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff. *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998)). The plaintiff need not present evidence in each of these categories to avoid summary judgment. *Aka*, 156 F.3d at 1289. Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case. *Id.* at 1291.

## 2. The Plaintiff Has Failed to Rebut the Defendant's Legitimate Non-Discriminatory Justification for the Plaintiff's Non-Selection

As noted, the plaintiff has alleged that the USCIS discriminated against him on the basis of his race and national origin when it did not select him for the Associate Counsel vacancy in the Dallas, Texas office. Am. Compl. ¶¶ 41-50. The defendant has presented a legitimate, non-discriminatory justification for the plaintiff's non-selection: namely, that the plaintiff was not as qualified and did not interview as well as the ultimate selectee, Michael Finley. Def.'s Mot. for Summ. J. at 8-10. Thus, the court foregoes an examination of the plaintiff's prima facie case and turns directly to the central issue – whether the plaintiff has produced sufficient evidence for a reasonable fact-finder to conclude that the defendant's asserted justification was not the actual reason for the plaintiff's non-selection and that the defendant unlawfully discriminated against the plaintiff. *See Brady,* 520 F.3d at 494.

This Circuit has held that "when an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was 'significantly better qualified for the job' than those ultimately chosen." *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)). As the Circuit explained in *Adeyemi*,

> the qualifications gap must be 'great enough to be inherently indicative of discrimination.' Only then could the fact-finder 'legitimately infer that the employer consciously selected a less-qualified candidate – something that employers do not usually do, unless some other strong consideration, such as discrimination enters into the picture.' In cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination because the jury would 'assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.'

525 F.3d at 1227 (quoting *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998)).

This Circuit has made clear, however, that

> [a] plaintiff attacking a qualifications-based explanation is . . . not limited to comparing his qualifications against those of the successful candidate. The plaintiff can instead seek to expose other flaws in the employer's explanation. For example, the plaintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision. Or a plaintiff can attempt to show that the employer's explanation misstates the candidates' qualifications . . . . Adequate evidence of this type may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination.

*Aka*, 156 F.3d at 1295.

In this case, the plaintiff has not attempted to show that he was a more qualified candidate than Finley. *See generally* Pl.'s Disparate Treatment Mem. Indeed, the plaintiff offers nothing to rebut the evidence presented by the defendant that Finley had more legal experience,

possessed a significantly wider array of legal experience and performed than the plaintiff better during his interview.[9]  *See* Def.'s Mot. for Summ. J. at 8-9; *see generally* Pl.'s Disparate Treatment Mem.; Pl.'s Statement.

Instead, the plaintiff contends that a reasonable fact-finder could infer discrimination from evidence that Patterson and Muhletaler: (a) unjustifiably held the plaintiff to a higher standard than the other interviewees; (b) excluded African-American candidates who were more qualified than the white applicants selected for interviews; (c) relied on improper selection criteria in assessing the candidates; and (d) exhibited discriminatory attitudes towards individuals of the plaintiff's race and national origin.  The plaintiff also contends that (e) the defendant's shifting explanations for the plaintiff's non-selection give rise to an inference of an illicit discriminatory motive.  The court considers these assertions in turn.

### a.  Allegation that Patterson and Muhletaler Unjustifiably Held the Plaintiff to a Higher Standard than the Other Interviewees

The plaintiff contends that a discriminatory intent can be inferred from the fact that Patterson and Muhletaler unjustifiably held the plaintiff to a higher standard than the other applicants they selected for interviews.  Pl.'s Disparate Treatment Mem. at 20-42.  In support of this contention, the plaintiff points to a portion of Patterson's declaration, in which she states that she and Muhletaler

> were initially undecided as to whether to invite [the plaintiff] for an interview, as his credentials and experience appeared weaker than any of the other applicants that [they] planned to interview.  In order to ultimately be offered the position, [the plaintiff] *would need an outstanding interview relative to the other applicants, and his performance would have had to significantly outweigh his weaker credentials and experience*.

---

[9]    For instance, the defendant has offered unrebutted evidence that at the time they interviewed for the position, Finley had almost seven years of legal experience, including five years of federal service in various components of the Department of Homeland Security, whereas the plaintiff had only twenty months of experience as an attorney, all of which he spent  practicing in immigration court.  Patterson Decl., Ex. F at 1-3 & Ex. G at 1-2.

*Id.* at 24 (quoting Patterson Decl. ¶ 8) (emphasis added).  This "admission," the plaintiff argues,

proves that he was not given an equal opportunity to compete for the position.  *Id.*

To explain why she considered the plaintiff the weakest of the six remaining candidates,

Patterson listed the following "reservations" she had about the plaintiff's application, in order of

concern:

- His resume indicated limited practice experience of only 20 months, since September 2002.
- His resume contained a significant four-year career gap between his undergraduate graduation in December 1990 and the beginning of his military career in January 1995, which was not explained.
- While his writing sample was good overall, it did contain a sentence fragment.
- His law school . . . historically has bar pass rates that are significantly lower than other Texas law schools, and as such has an academically weak reputation as compared to other Texas law schools.  While [Patterson did] not specifically remember telling Ms. Muhletaler that this school was 'not too good,' any such statement made by [her] was based upon the academic reputation of this school . . . .  [She] confirmed [her] assessment of its academic standing by checking in the *U.S. New[s] & World Report* law school ratings, which showed it to be a 4th tier law school.

Patterson Decl. ¶ 8.

As noted by the plaintiff, Muhletaler offered a similar explanation for why she considered

the plaintiff to have the weakest credentials of the six interviewees.  Pl.'s Disparate Treatment

Mem. at 25-26 (quoting Muhletaler Decl. ¶6).  Muhletaler stated that she

was concerned that [the plaintiff] had very limited attorney experience as compared to the other applicants.  At the time that [the plaintiff] applied for the position . . . he had only been practicing law for approximately 18 months.  All of the other applicants selected for an interview had been practicing law for a longer period of time than [the plaintiff].  Based on the strong qualifications of the other applicants, [she] was not convinced that [the plaintiff's] experience was equivalent to or exceeded that of the other applicants [they] had already identified for an interview.  [The plaintiff's] legal experience and qualifications were the weakest of all the applicants identified for an interview.

Muhletaler Decl. ¶ 6.

The plaintiff argues that Patterson and Muhletaler's justification for holding the plaintiff to a higher standard – that the plaintiff had the weakest credentials of the six interviewees – is demonstrably false and served as nothing more than a pretext for racial and national origin discrimination. Pl.'s Disparate Treatment Mem. at 26-39. To support this contention, the plaintiff argues that based on the selection criteria articulated by Patterson and Muhletaler, he was more qualified for the position than one of the other interviewees, Justin Nielsen. *Id.* at 28-39. The plaintiff proceeds to offer a detailed comparison between his qualifications and those of Nielsen. *See id.*

The plaintiff's effort to demonstrate pretext in this manner fails for at least two reasons. First, it is far from clear that the plaintiff was, as he contends, significantly more qualified for the position than Nielsen. For instance, although the plaintiff argues that he had substantially more legal experience because he had litigated alien removal and deportation proceedings following his graduation from law school,[10] Pl.'s Disparate Treatment Mem. at 31-33, the record indicates that Nielsen had spent the same period working as a clerk for an immigration judge, during which time he had "[d]raft[ed] decisions and memoranda of law for immigration judges" and "[a]nalyze[d] various applications for relief including political asylum, adjustment of status, cancellation of removal, waivers of inadmissibility and withholding of removal," Pl.'s Mot. & Opp'n, Ex. 2A. Nielsen had therefore amassed experience plainly relevant to the duties encompassed by the Associate Counsel position, which, according to the vacancy announcement, included adjudicating applications for immigration benefits and services and called for experience in asylum and refugee law and immigration court. *Id.*, Ex. 1H.

_____

[10] Both Nielsen and the plaintiff graduated from law school in May 2002. Pl.'s Mot. & Opp'n, Exs. 1A, 2B.

Likewise, although the plaintiff asserts that he had significantly better academic credentials than Nielsen because he had graduated with a higher grade point average, Pl.'s Disparate Treatment Mem. at 33-34, the record indicates that Patterson and Muhletaler believed that Nielsen had graduated from a law school with a stronger academic reputation, Pl.'s Mot. & Opp'n, Exs. 1B, 2B.[11]  Furthermore, Patterson and Muhletaler rated Nielsen's cover letter higher than the plaintiff's and gave the two candidates' writing samples and resumes relatively equal marks, *see* Pl.'s Mot. & Opp'n, Exs. 1B, 2B, and the plaintiff has offered nothing to challenge the accuracy of these assessments, *see generally* Pl.'s Disparate Treatment Mem.

Accordingly, the record does not support the plaintiff's contention, based on his own self-assessment, that he clearly possessed stronger credentials than Nielsen.  *See Jo v. Dist. of Columbia*, 582 F. Supp. 2d 51, 62-63 (D.D.C. 2008) ("Although Plaintiff clearly values his own credentials and experiences, a plaintiff's subjective assessment of his own record is largely irrelevant.").  Although one could quibble over the differences between the two candidates' qualifications, or the wisdom of relying on law school rankings in making employment decisions, these minor objections do not support an inference that Patterson and Muhletaler acted with discriminatory motives when they deemed the plaintiff a weaker candidate than Nielsen. *See Adeyemi*, 525 F.3d at 1227 (noting that a reasonable fact-finder could not infer discrimination based solely on small differences in the qualifications of the candidates); *see also Fischbach v. Dist. of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (observing that although certain errors in judging a candidate's qualifications are "too obvious to

---

[11]     Patterson and Muhletaler noted on the plaintiff's application materials that the plaintiff's law school was "last tier," Pl.'s Mot. & Opp'n, Ex. 1B, while Nielsen's law school was ranked "#67," *id.*, Ex. 2B, apparently referring to the *U.S. News & World Report* law school rankings. Furthermore, Patterson states that because she taught as a professor at Baylor University School of Law and as an adjunct professor at the law schools at Texas Wesleyan University and Southern Methodist University, she is "generally familiar with the bar pass rates of all the Texas law schools and their academic reputations in Texas."  Patterson Decl. ¶ 8 n.3.

be unintentional," the relevant inquiry must focus on "whether the employer honestly believed in the reasons it offers," not whether the reasons are just, fair or sensible (quoting *McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 373 (7th Cir.1992))).

At any rate, even if the plaintiff could demonstrate that he was significantly more qualified for the position than Nielsen, the significance of such a finding would be blunted by the fact that like the plaintiff, Nielsen was not listed on the memorandum of top candidates forwarded to Carpenter and was not selected for the position. *See* Pl.'s Mot. & Opp'n, Ex. 25A at 1-3. That the plaintiff was more qualified than an individual whom Patterson and Muhletaler also did not consider a top candidate provides little basis from which to infer discriminatory intent. *See Aka*, 156 F.3d at 1295 (observing that although a plaintiff attacking a qualifications-based justification is not limited to comparing his qualifications to those of the selectee, he must provide adequate evidence of flaws in the employer's explanation to support a reasonable inference of discrimination).

The plaintiff also briefly suggests that he was more qualified than Loriane Pickrell, one of the individuals Patterson and Muhletaler forwarded to Carpenter for consideration. Pl.'s Disparate Treatment Mem. at 56-58. Specifically, the plaintiff notes that in Patterson's memorandum to Carpenter, Patterson had written that Pickrell had a "limited knowledge of immigration law" and would likely be a better fit in a different division. Pl.'s Mot. & Opp'n, Ex. 25A at 2. Although the plaintiff suggests that Pickrell's limited knowledge of immigration law rendered her "unqualified" for the position, *see* Pl.'s Disparate Treatment Mem. at 58, nothing in the vacancy announcement indicates that experience in immigration law was a precondition to consideration, *see* Pl.'s Mot. & Opp'n, Ex. 1H. Furthermore, the plaintiff overlooks the fact that Pickrell had seven years of litigation experience at the time she applied (compared to the

plaintiff's twenty months), had clerked for a federal judge on the Eighth Circuit Court of Appeals (where she had worked on cases involving immigration law) as well as two justices of the Arkansas Supreme Court and had submitted an "outstanding" writing sample.  *Id.*, Ex. 25A at 2. Thus, the qualifications gap between Pickrell and the plaintiff hardly suggests a discrimination.

In sum, the fact that Patterson and Muhletaler viewed the plaintiff as the least qualified candidate among the six selected for interviews does not support an inference of discrimination. Accordingly, the plaintiff has not raised a genuine dispute as to whether Patterson and Muhletaler discriminated against the plaintiff when they determined that he would have to perform better than the other interviewees to be selected for the position.

### b.  Alleged Exclusion of African-American Candidates

According to the plaintiff, discriminatory intent can be inferred from the fact that Patterson and Muhletaler chose not to interview African-American candidates with credentials superior to those of the five white interviewees.  Pl.'s Disparate Treatment Mem. at 39-42.  To support this contention, the plaintiff asserts that Clarence Wagner, an African-American attorney who applied for the Associate Counsel position, was not selected for an interview despite the fact that he possessed qualifications superior to those of Pickrell or Emmons.  *Id.*

The plaintiff asserts that Wagner was a superior candidate to Pickrell because Wagner possessed more immigration law experience than Pickrell.  *Id.* at 40; *see also* Pl.'s Mot. & Opp'n, Ex. 25A.  Yet even if immigration law experience was "absolutely essential," as Patterson acknowledged in an e-mail to an unsuccessful candidate, Pl.'s Mot. & Opp'n, Ex. 8B, there is no evidence that immigration law experience was the sole or even the most important criterion used to evaluate candidates.  To the contrary, the defendant has offered unrefuted

evidence that Patterson and Muhletaler considered multiple factors in evaluating applicants for the position, including

> the applicant's legal career as a whole, how long the applicant had practiced law, the depth of his immigration expertise, his other areas of legal expertise that may prove valuable such as criminal law or federal court practice, his people skills, his work ethic, the breadth and quality of his prior legal practice, his writing skills . . . his educational credentials, and supervisory comments respecting the applicant.

Patterson Decl. ¶ 14; *see also* Muhletaler Decl. ¶¶ 15, 17-22 (describing the evaluation of the various applicants). The fact that Wagner had more immigration law experience than Pickrell, even if true, would hardly demonstrate that he was a superior candidate. And the plaintiff has offered no other comparison of the qualifications of Wagner and Pickrell.

The plaintiff offers even less explanation for his contention that Wagner was a superior candidate to Emmons, stating only that Emmons "received a less than favorable recommendation from two of his supervisor, and did not have Mr. Wagner's qualifications." Pl.'s Disparate Treatment Mem. at 40-41. The plaintiff, however, has cited nothing in the record to support his contention that Emmons received unfavorable reviews from his supervisors. *See id.* To the contrary, Patterson's memorandum to Carpenter notes that she spoke with Emmons's supervisors, both of whom noted Emmons was "meticulously organized and neat," "gets along well with everyone" and "is a better than average attorney." Pl.'s Mot. & Opp'n, Ex. 25A. Beyond this reference to some allegedly unfavorable reviews, the plaintiff has offered no comparison of the relative qualifications of Wagner and Emmons. *See* Pl.'s Disparate Treatment Mem. at 40-41.

Finally, the plaintiff contends that while Patterson considered Wagner's labor law experience a disqualifying factor, she noted Finley's labor law experience as one of his strengths. *Id.* at 41-42 (citing Pl.'s Mot. & Opp'n, Exs. 7, 25A). In reality, however, Patterson did not

suggest that Wagner's labor law experience rendered him unqualified for the position; rather, she noted simply that Wagner "seemed very labor oriented" and had relatively little experience with immigration law, suggesting that Wagner's lack of interest in immigration law was one weakness to his application. Pl.'s Mot. & Opp'n, Ex. 7. Furthermore, contrary to the plaintiff's assertion, Patterson did not discuss Finley's labor experience in her memorandum; rather, she noted that Finley had experience with employment law, *id.*, Ex. 25A at 1, one of the criteria listed in the vacancy announcement as relevant to the position, *id.* Ex. 1H.

In sum, the plaintiff's contention that Patterson and Muhletaler discriminated against other African-American applicants is based on nothing more than incomplete comparisons of the candidates and distorted interpretations of the record. Accordingly, this evidence does not raise a genuine dispute regarding the defendant's legitimate non-discriminatory justification for the plaintiff's non-selection.

### c. Alleged Use of Improper Selection Criteria

The plaintiff further contends that Patterson and Muhletaler relied on improper selection criteria unrelated to job performance and that this evidence gives rise to an inference of discrimination. Pl.'s Disparate Treatment Mem. at 43-47. More specifically, the plaintiff argues that Patterson and Muhletaler "nullified" the plaintiff's academic credentials because he had graduated from a "fourth tier," historically Black law school and punished the plaintiff for a four-year employment gap on his resume without asking him to explain the gap. *Id.*

Neither argument has merit. Although Patterson and Muhletaler remarked that the plaintiff's law school was "last tier" and "not too good," *see* Pl.'s Mot. & Opp'n, Exs. 1A, 1B, none of these comments expressly or impliedly referred to the racial makeup of the school. Indeed, the plaintiff has offered nothing to refute Patterson's claim that her assessment of the

plaintiff's law school was based on the fact that it historically had "bar pass rates that are significantly lower than other Texas law schools" and that it had "an academically weak reputation as compared to other Texas law schools." Patterson Decl. ¶ 8. Accordingly, the plaintiff has offered no evidence that the "nullification" of his academic credentials had anything to do with his race.

Likewise, the plaintiff has offered nothing to suggest that consideration of the four-year gap on the plaintiff's resume was motivated by racial or national origin discrimination. *See generally* Pl.'s Disparate Treatment Mem. The plaintiff has offered no evidence that Patterson and Muhletaler's treatment of this employment gap had any nexus to the plaintiff's race or national origin. *See generally id.* Nor has the plaintiff offered any evidence that any of the interviewees were treated any differently than the plaintiff with respect to resume gaps. *See generally id.*

Lastly, the plaintiff argues that the defendant deviated from USCIS hiring policies by appointing Patterson to act as an "all-White" hiring "panel of one" unrestrained by any "ascertainable standards" for assessing the candidates. Pl.'s Disparate Treatment Mem. at 46-47. This assertion is belied by the record. First, Carpenter – not Patterson – was the official ultimately responsible for selecting the individual to fill the vacancy. Patterson Decl. ¶ 13. Moreover, the record clearly demonstrates that Muhletaler, a Hispanic woman, also served as a recommending official and worked closely with Patterson in evaluating the candidates. Muhletaler Decl. ¶¶ 1, 3, 6-8; Patterson Decl. ¶¶ 6, 13. Finally, the record indicates that Patterson and Muhletaler applied objective, articulated hiring criteria in assessing the candidates. *See* Pl.'s Mot. & Opp'n, Exs. 1B, 2B; Patterson Decl. ¶ 11. Thus, the plaintiff has offered no

record support for his assertion that Patterson's "unfettered discretion" provided her "a ready mechanism to exclude minority applicants."  Pl.'s Disparate Treatment Mem. at 46-47.

In sum, the plaintiff's evidence that Patterson and Muhletaler allegedly relied on improper selection criteria does not give rise to an inference of unlawful discrimination. Accordingly, this evidence does not raise a genuine dispute regarding the defendant's legitimate non-discriminatory justification for the plaintiff's non-selection.

### d.  Other Evidence of Allegedly Discriminatory Attitudes

The plaintiff also argues that Patterson revealed her discriminatory intent by contacting the plaintiff's supervisor to inquire about him before he was selected for an interview and by certain notations she made on his application materials.  Pl.'s Disparate Treatment Mem. at 47-52.  These assertions are clearly without merit.

According to the plaintiff, the fact that Patterson deviated from USCIS hiring policies by contacting the plaintiff's supervisor before selecting him for an interview demonstrates her discriminatory motives.  *Id.* at 47.  The plaintiff, however, has offered no evidence to suggest that this practice was in any discriminatory or had anything to do with his race or national origin. *See generally id.*

The plaintiff then asserts that Patterson wrote on his application materials, "Nat'zd from Nigeria."  Pl.'s Mot. & Opp'n, Ex. 2.  The plaintiff has not, however, explained how this notation betrays any discriminatory attitude on Patterson's part.  *See generally* Pl.'s Disparate Treatment Mem.  In fact, as the plaintiff has acknowledged, Patterson has stated that the plaintiff's status as a naturalized citizen was an asset because "as an employee that has gone through the immigration and naturalization process [he] will have a strong interest in our work and a unique understanding of the process."  *Id.* at 35 (citing Patterson Decl. ¶ 20).

In a similar vein, the plaintiff points out that Patterson made a notation on the plaintiff's application materials indicating that during the interview, the plaintiff stated that it would be difficult for him to deport children and old women accused of fraud. Pl.'s Mot. & Opp'n, Ex. 1C. The plaintiff denies that he made this remark and states that this notation "manifest[s] [Patterson's] bigoted subjective belief that, Plaintiff, as [a] person of Nigerian origin, has problems deporting people for fraud and that all Nigerians are fraudulent." Pl.'s Disparate Treatment Mem. at 49. The plaintiff, however, has not explained how Patterson's allegedly bigoted attitudes toward Nigerians can be extrapolated from the notation on his application materials, which contained no reference Nigerians at all. *See* Pl.'s Mot. & Opp'n, Ex. 1C.

Instead, the plaintiff attempts to derive evidence of Patterson's discriminatory attitudes from an e-mail sent to her by another USCIS employee, in which the employee writes that "[t]he alien is a Nigerian convicted of bank fraud (what a surprise)." Pl.'s Mot. & Opp'n, Ex. 12. It is not clear, however, from the heavily redacted version of the e-mail submitted by the plaintiff that the sender is, in fact, suggesting that it is not a surprise that this individual has been convicted of bank fraud because he is a Nigerian, or for some other reason in another part of the e-mail redacted by the plaintiff. *See id.* At any rate, the fact that Patterson was the *recipient* of such an e-mail hardly demonstrates that she harbored discriminatory attitudes towards Nigerians or that there was a "pervasive institutional culture of negative stereotyping of people of Nigerian origin." *See* Pl.'s Disparate Treatment Mem. at 50; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (observing that "offhand comments" and "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.").

Accordingly, the plaintiff has not presented sufficient evidence from which a reasonable fact-finder could conclude that Patterson harbored discriminatory attitudes towards African Americans or people of Nigerian origin. The plaintiff, therefore, has not raised a genuine dispute regarding the defendant's legitimate non-discriminatory justification for the plaintiff's non-selection.

**e. Discrepancy in the Explanations Given for the Plaintiff's Non-Selection**

Finally, the plaintiff contends that the court can infer discrimination from the fact that the defendant has offered differing explanations for the plaintiff's non-selection, specifically with respect to the significance of the plaintiff's law school. Pl.'s Disparate Treatment Mem. at 52-56. The plaintiff points out that in an affidavit Patterson submitted to the Equal Employment Office ("EEO") in 2005, she stated that the rankings of law schools "was not a critical or determinative factor" in the plaintiff's non-selection. Pl.'s Mot. & Opp'n, Ex. 9C ("Patterson 2005 Aff.") ¶ 4. Yet in its 2009 opposition to the plaintiff's motion for leave to file a second amended complaint, the defendant stated that the "[a]pplicant's law school ranking was a critical factor in the selection process." Pl.'s Disparate Treatment Mem. at 53 (quoting Def.'s Opp'n to Pl.'s 2d Mot. to Amend Compl. at 10). This discrepancy, the plaintiff argues, reveals an illicit motive underlying the plaintiff's non-selection. *Id.* at 52-56.

Despite the superficial inconsistency, the two statements present little substantive contradiction. In her 2005 affidavit, Patterson states that she and Muhletaler

> looked at numerous factors in making [their] selection and no one factor was determinative in [their] selection. [They] looked at all the factors taken together. Thus, the ranking of law schools was merely one of many factors considered, and was not a critical or determinative factor. Likewise, whether a candidate interviewed by telephone or in person was not a determinative factor.

Patterson 2005 Aff. ¶ 4.  Thus, in context, it is clear that when Patterson stated that the plaintiff's law school ranking was not a "critical" factor, she was stating that law school rankings were not a "determinative" but were simply one factor among many that were considered in evaluating candidates.  *See id.*

In its opposition to the plaintiff's motion for leave to file a second amended complaint, the defendant included a heading stating that the "Plaintiff knew that the Applicants' Law School Ranking Was a Critical Factor in the Selection Process Before He received the Supplemental Production."  Def.'s Opp'n to Pl.'s 2d Mot. to Amend Compl. at 10.  In this section of the opposition, the defendant argued that leave to amend should be denied because the plaintiff had long been aware that Patterson and Muhletaler had considered law school rankings in making their selection criteria.  *Id.* at 10-11.  According to the defendant, law school rankings were "critical" in that they were obviously important to Patterson and Muhletaler in evaluating candidates.  *See id.*

This assertion – that law school rankings were an important selection criterion – is, of course, entirely consistent with Patterson's statement that the law school rankings were one of many factors considered in assessing applicants.  *See* Patterson 2005 Aff. 4.  Thus, contrary to the plaintiff's assertion, the defendant has not offered shifting explanations for the plaintiff's non-selection and the apparent inconsistency between these two statements does not raise an inference of discriminatory intent.

### f.  Conclusion

In sum, the defendant has offered a legitimate, non-discriminatory justification for the plaintiff's non-selection: that the plaintiff was not as qualified as the ultimate selectee.  The plaintiff has offered no evidence from which a reasonable fact-finder could conclude that this

explanation was pretext for unlawful discrimination. Accordingly, the court grants the defendant summary judgment on the plaintiff's disparate treatment claim.

### C. The Court Grants Summary Judgment to the Defendant on the Plaintiff's Disparate Impact Claims

#### 1. Legal Standard for Disparate Impact

To establish a prima facie case of disparate impact, the plaintiff must show that a facially neutral employment policy has a disproportionately adverse effect on a protected class of people. *See Ricci v. DeStafano*, 129 S. Ct. 2658, 2672-73 (2009) (citing 42 U.S.C. § 2000e-2(k)(1)(A)); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)). First, the plaintiff must first identify the specific employment practice that is challenged. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988). Next, the plaintiff must establish causation; "that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.*; *see also Ricci*, 129 S. Ct. at 2678 (observing that a prima facie of disparate impact requires "essentially, a threshold showing of a significant statistical disparity" (citing *Conn. v. Teal*, 457 U.S. 440, 446 (1982))). This evidence of causation must establish that the employment practice "select[s] applicants for hire or promotion in a . . . pattern significantly different from that of the pool of applicants." *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).

If the plaintiff establishes that the employment practice has an adverse impact on a protected class, the burden shifts to the employer to justify the practice by demonstrating that the challenged practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i); *see also Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1454 (D.C. Cir. 1988) (observing that an employer may avoid disparate impact liability by

demonstrating that the challenged practice has "a manifest relationship to the employment in question" (quoting *Teal*, 457 U.S. at 446-47)).  The burden on the employer is one of persuasion, not merely production.  *Phillips v. Cohen*, 400 F.3d 388, 398 (6th Cir. 2005) (citing 42 U.S.C. § 2000e-2(k)(1)(A)); *Anderson v. Zubieta*, 180 F.3d 329, 404 n.12 (D.C. Cir. 1999) (citing 42 U.S.C. § 2000e(m)).  If the employer satisfies this burden, the plaintiff must demonstrate "that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs."  *Ricci*, 129 S. Ct. at 2673 (citing 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii) and (C)).

### 2.  The Plaintiff Has Not Raised a Genuine Issue of Fact as to His Prima Facie Case of Disparate Treatment

As previously discussed, the plaintiff has alleged that the defendant's reliance on the *U.S. News & World Report* law school rankings had the effect of excluding African-American graduates of historically Black law schools from employment.  Am. Compl. ¶ 44(d).  The plaintiff has also alleged that the defendant's consideration of an applicant's ties or familiarity with the Dallas area had the effect of excluding foreign-born applicants from selection for positions within the USCIS.  *Id.* ¶ 44(e).  As the court previously noted, these allegations give rise to a claim of disparate impact discrimination.  Mem. Order (Mar. 17, 2010) at 9.

The defendant asserts that the plaintiff has failed to make out a prima facie case of disparate impact because he has not offered sufficient statistical evidence to support an inference that either practice identified by the plaintiff has the effect of excluding individuals of a protected class.  *See generally* Def.'s Supplemental Mem.; *see also* Def.'s Reply in Support of Def.'s Mot. for Summ. J. ("Def.'s Reply") at 14-23.  The plaintiff responds that he is not required to produce any statistical evidence to establish a prima facie case of disparate impact.  Pl.'s Disparate Impact Mem. at 2-21.  Alternatively, the plaintiff offers a statistical analysis

purporting to demonstrate that the challenged hiring practices have the effect of excluding African-American and foreign-born attorneys from promotional positions. *Id.* at 22-33.

### a. The Plaintiff Was Required to Offer Statistical Evidence to Establish Causation

To establish a prima facie case of disparate treatment, the plaintiff must not only identify the challenged employment practice, but must also demonstrate that the practice causes the exclusion of applicants on the basis of their membership in a protected class. 42 U.S.C. § 2000e-2(k)(1)(A)(i). Causation is established through statistical evidence showing a significant disparity between the make-up of the applicant pool and the selectees. *See Watson*, 487 U.S. at 994; *Ricci*, 129 S. Ct. at 2678; *see also Aliotta v. Bair*, 614 F.3d 556, 565 (D.C. Cir. 2010) (noting that to demonstrate a prima facie case of disparate impact based on age discrimination, the plaintiff must "offer statistical evidence of a kind and degree sufficient to show the employment decision disproportionately impacts older employees" (citing *Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984))); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 382 (2d Cir. 2006) (observing that after identifying the challenged employment practice, "[t]he plaintiff must then produce statistical evidence showing that the challenged practice 'causes a disparate impact on the basis of race, color, religion, sex, or national origin'" (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i))).

The plaintiff contends that he is not required to offer any statistical evidence to establish his prima facie case because the 1991 amendments to Title VII relieved employees from the obligation of offering statistical evidence when the elements of a challenged hiring procedure are incapable of separation for analysis. Pl.'s Disparate Impact Mem. at 5-7, 9-15, 18-21. This argument rests on a basic misapprehension of the changes brought about by the 1991 amendments to Title VII. It is true that as a result of the 1991 amendments, Title VII now

provides that if the employee "can demonstrate . . . that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice."  42 U.S.C. § 2000e-2(k)(1)(B)(i).  This provision, however, merely authorizes employees to demonstrate causation by showing the discriminatory effect of an overall hiring process, rather than the discriminatory effects of specific, isolated practices playing a role in the process, when the effects of those isolated practices cannot be analytically separated.  *See id.*; *see also Phillips*, 400 F.3d at 397-98 (observing that the 1991 amendments to Title VII superseded portions of Supreme Court precedent holding that a plaintiff in a disparate impact case must show the discriminatory effect of specific practices on protected group members); *cf. Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989) (holding that an employee alleging disparate impact is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities" (quoting *Watson*, 478 U.S. at 994)), *superseded by statute*, 42 U.S.C. § 2000e-2(k)(1)(B)(i). Nothing in this amended provision suggests that a plaintiff is excused from demonstrating causation through statistical evidence simply because the effect of the specific practices cannot be analytically distinguished.[12]  *See* 42 U.S.C. § 2000e-2(k)(1)(B)(i).

The plaintiff also appears to suggest that statistical evidence is not needed in this case because the disproportionate impact of the challenged employment practices is plain on its face. *See* Pl.'s Disparate Impact Mem. at 19-22.  The plaintiff argues that because he was not selected for the position despite graduating at the top of his class, "[t]he evidence on its face shows that

---

[12]    The plaintiff also argues that "Congress carved-out a second exception [to the statistical evidence requirement] in the 'The Interpretative Memorandum'" that accompanied the 1991 amendments to Title VII.  Pl.'s Disparate Impact Mem. at 9-10.  This "interpretative memorandum" is simply part of the legislative history to the 1991 amendments to Title VII.  *See* 137 Cong. Rec. S15276 (daily ed. Oct. 25, 1991) (interpretative memorandum), *reprinted in* 1991 U.S.C.C.A.N. 549, 767. Plainly, the 1991 amendments to Title VII and the legislative history to those amendments cannot give rise to two separate "exceptions" to the statistical evidence requirement.

no job applicant who is a graduate of [the plaintiff's law school] will ever be successful with the defendant." *Id.* at 20. This "insurmountable barrier," the plaintiff argues, results from the defendant's reliance on *U.S. News & World Report* law school rankings, which place the plaintiff's law school in the "fourth tier."[13] *Id.*

As the plaintiff rightly points out, some courts have suggested that statistical proof may not be required if the employee offers evidence "to show that a facially neutral policy must in the ordinary course have a disparate impact on a protected group of which an individual plaintiff is a member." *Craig v. Ala. State Univ.*, 804 F.2d 682, 687 n.7 (11th Cir. 1986) (quoting *Mitchell v. Bd. of Trustees of Pickens Cnty.*, 599 F.2d 582, 585 n.7 (4th Cir. 1979)). The plaintiff, however, has offered no evidence, beyond his own non-selection, that reliance on the *U.S. News & World Report* law school rankings necessarily results in the disproportionate exclusion of African-American candidates. *See generally* Pl.'s Disparate Impact Mem.; *see also Dothard v. Rawlinson*, 433 U.S. 321, 331 (1977) (observing that plaintiffs "are not required to exhaust every possible source of evidence, if the evidence actually presented on its face *conspicuously demonstrates* a job requirement's *grossly discriminatory impact*") (emphasis added). The mere fact that Patterson and Muhletaler did not select the plaintiff is insufficient to demonstrate that reliance on law school rankings must in the ordinary course exclude African-American candidates from meaningful consideration. Accordingly, like most disparate impact plaintiffs, the plaintiff in this case is required to offer evidence of statistical disparity in order to satisfy his prima facie burden. *See Ricci*, 129 S. Ct. at 2678.

---

[13] The plaintiff does not address the defendant's consideration of ties to the Dallas area in this portion of his argument. *See* Pl.'s Disparate Impact Mem. at 19-22. Nor does the plaintiff offer statistical evidence to support his claim that consideration of an applicant's ties to the Dallas-area has a disproportionate impact on foreign-born applicants. Accordingly, the plaintiff has failed to raise a genuine issue of fact as to whether consideration of that factor has an impermissible disparate impact on the plaintiff's protected class.

**b. The Plaintiff's Statistical Evidence Fails to Raise a Genuine Dispute Regarding the Plaintiff's Prima Facie Case of Disparate Impact**

As noted, to demonstrate causation, the plaintiff must offer statistical evidence "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants . . . because of their membership in a protected group." *Watson*, 487 U.S. at 994. To make such a showing, plaintiffs often employ a standard deviation analysis designed to measure the statistical significance of disparities between expected and actual selection rates of applicants from a protected group. *See, e.g.*, *Anderson*, 180 F.3d at 339-40 (concluding that a standard deviation of 1.96 or higher indicates "a level of statistical significance . . . sufficient to establish a prima facie case of both disparate treatment and disparate impact"). Whatever the method of analysis, the plaintiff must demonstrate the existence of a statistical disparity between expected and actual outcomes significant enough to give rise to an inference of discrimination. *See Palmer v. Schultz*, 815 F.2d 84, 91 (D.C. Cir. 1987) (observing that "if the disparity between selection rates for men and women is sufficiently large so that the probability that the disparities resulted from chance is sufficiently small, then a court will infer from the numbers alone that, more likely than not, the disparity was a product of unlawful discrimination" (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977))); *see also Albermarle Paper Co.*, 422 U.S. at 425 (explaining that the plaintiff must show that the challenged practice results in selections in a pattern "significantly different from that of the pool of applicants").

To demonstrate the disparate impact of the defendant's reliance on the *U.S. News & World Report* law school rankings, the plaintiff first attempts to show that "even African-American graduates of the University of Texas [School of Law] are adversely impacted by Defendant's employment practices." Pl.'s Disparate Impact Mem. at 22. Using data collected from the State Bar of Texas and the University of Texas, the plaintiff constructs a table of

"selection rates" purportedly representing the percentage of instances in which African-American graduates of the University of Texas School of Law "can . . . compete with their White counterparts." *Id.* at 23-25.

The plaintiff's analysis is flawed on multiple levels. First, the plaintiff calculates his "selection rates" by simply dividing the number African-American and white graduates of the University of Texas School of Law by the total number of University of Texas School of Law graduates living in Texas. *Id.* at 23. How these figures reveal anything about the "selection rates" of University of Texas School of Law graduates is entirely unclear. More fundamentally, given that the employment practice challenged by the plaintiff is the defendant's reliance on the *U.S. News & World Report* law school rankings, and the resulting preference given to "first tier" schools like the University of Texas School of Law, the plaintiff's comparison of African-American and white graduates of the University of Texas School of Law has little relevance to the plaintiff's disparate impact claim. Accordingly, the plaintiff's analysis of "selection rates" of University of Texas School of Law graduates provides no support for his prima facie case.

Next, the plaintiff attempts to demonstrate the disparate impact of the defendant's reliance on the *U.S. News & World Report* law school rankings by calculating the "selection rates" of African-American graduates of the plaintiff's law school and white graduates of the University of Texas School of Law. Pl.'s Disparate Impact Mem. at 28-29. Again, the plaintiff attempts to calculate "selection rates" of these two groups of graduates by dividing the total number of each pool of graduates by a "Total" of 12,092. *Id.* at 29. The plaintiff, however, does not explain the basis of the "Total" figure which he uses to derive his percentages. *See id.* Moreover, the plaintiff does not explain how this isolated percentage reveals anything about the

significance of the defendant's reliance on the *U.S. News & World Report* law school ranking or the resulting preference given to "first tier" law schools. *See id.*

To satisfy his prima facie burden, the plaintiff was required to offer statistical analysis showing that the defendant's challenged practices resulted in a disproportionately low number of African-American or foreign-born attorneys being hired for vacancies at USCIS. *See Palmer*, 815 F.2d at 91. The simplistic, irrelevant calculations offered by the plaintiff do not come close to satisfying this burden. Accordingly, the court grants summary judgment to the defendant on the plaintiff's disparate treatment claims.


## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for summary judgment, denies the plaintiff's cross-motion for summary judgment and denies as moot the defendant's motion to strike. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 24th day of February, 2011.


RICARDO M. URBINA
United States District Judge